# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

EUGENE DYSON,

    Plaintiff,

v.

WEXFORD HEALTH SOURCES,
P.A. JAMISON,
RICHARD MILLER,
DENISE GILSINGER,
DR. STALLWORTH,
DR. MEMAR,
DR. DIDDEN,
DR. MANNING and
DR. OTEYZA,[1]

    Defendants.

Civil Action No. TDC-19-0307

## MEMORANDUM OPINION

Plaintiff Eugene Dyson, an inmate confined at the Roxbury Correctional Institution ("RCI") in Hagerstown, Maryland, has filed a civil action against Defendants Wexford Health Sources Inc. ("Wexford"), Crystal Jamison, P.A., Dr. Monica Stallworth-Kolimas, Dr. Mahboobeh Memarsadeghi, Dr. Ben Oteyza, Dr. Lawrence Manning, Dr. Didden, former RCI Warden Richard Miller, and former RCI Acting Warden Denise Gelsinger, alleging denial of adequate medical care in violation of the Eighth Amendment to the United States Constitution. Dyson alleges that he

---

[1] The Clerk shall amend the docket to reflect the correct names of Defendants Wexford Health Sources, Inc., Crystal Jamison, P.A., Dr. Monica Stallworth-Kolimas, Dr. Mahboobeh Memarsadeghi, Dr. Ben Oteyza, Dr. Lawrence Manning, and former Acting Warden Denise Gelsinger.

Dr. Didden has not been served with the Complaint, and the Complaint against him is dismissed without prejudice.

received inadequate medical care for persistent knee pain and that he is in need of a total knee replacement which Defendants have denied to him. Pending before the Court are a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment ("the Medical Defendants' Motion") filed by Defendants Wexford, Jamison, Dr. Stallworth-Kolimas, Dr. Oteyza, and Dr. Manning (collectively, "the Medical Defendants"), and a separate Motion to Dismiss, or in the Alternative, Motion for Summary Judgment ("the Correctional Defendants' Motion") filed by Defendants Warden Miller and Acting Warden Gelsinger (collectively, "the Correctional Defendants"). The Motions are fully briefed. Upon review of the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Defendants' Motions will be GRANTED.

## BACKGROUND

In 2009, Dyson was already an inmate at RCI. An x-ray of his knees showed a narrowing of both medial joint spaces and the presence of small patellar spurs. In July 2010, Dyson was examined by Dr. Ashok Krishnaswamy of Bon Secours Hospital in Baltimore, Maryland, who diagnosed Dyson with arthritis in both knees, with moderate arthritis in the left knee and early arthritis in the right. Dr. Krishnaswamy recommended arthroscopic debridement of the left knee, which was performed. Dr. Krishnaswamy discussed with Dyson, among other things, the progression of arthritis and the potential need for future surgery, and he noted that if the pain worsened in the right knee, Dyson could need an arthroscopy on that knee in the future.

On January 30, 2017, Dyson submitted a sick call slip stating that his knee problem was "acting up again" and "the pain is really bad/it's hard to walk." Med. Records at 5, Med. Defs. Mot. Summ. J. Ex. 1, ECF No. 18-4. He was seen the following day by a nurse, who noted that Dyson was using a cane and bilateral knee sleeves but walked with a steady gait. Dyson reported

that although he had not seen a medical provider for a year, his knee pain had been ongoing for several years, and he recounted a history of sports injuries to his knees. Although Dyson had no visible injury and had a full range of motion, his knees made a popping sound when bended. The nurse directed Dyson to use hot and cold compresses, ordered Motrin for pain relief, and referred Dyson to a physician.

On February 6, 2017, Dr. Ava Joubert-Curtis examined Dyson. Dyson confirmed that he had a left knee arthroscopy in 2009, had been prescribed Glucosamine in 2013 but stopped taking it when it did not work right away, and reported that his symptoms had worsened over the last two months. Dr. Joubert-Curtis observed swelling and a moderately reduced range of motion and diagnosed Dyson with severe osteoarthritis in both knees. Dr. Joubert-Curtis prescribed Glucosamine-Chondroitin for the osteoarthritis and Indomethacin for pain relief, and she ordered x-rays and bilateral knee braces. On February 13, 2017, Dyson was provided the knee braces.

On February 26, 2017, Dyson lost consciousness, fell down the stairs, and was sent to the Meritus Medical Center Emergency Department where he was diagnosed with having suffered a seizure. A magnetic resonance imaging procedure on his lumbar spine revealed mild multilevel spondylosis without any focal disc protrusion but with congenitally narrowed pedicles.

On March 13, 2017, Dyson was examined by Jamison, a physician's assistant. Jamison reviewed Dyson's x-rays, which showed no acute osseous abnormality and moderate degenerative joint disease in the knees with reduced joint space and osteophyte formation. Dyson reported that his knee pain was ten on a ten-point scale and that he had difficulty walking, even with a cane. He advised that he had been riding a cart to the dispensary and avoided going to the cafeteria because of the pain and his fear of falling. Jamison administered a Kenalog injection to his left

knee to reduce inflammation and requested an orthopedic consultation for Dyson. Dyson's Glucosamine prescription was refilled.

On March 23, 2017, the request for an orthopedic consultation was deferred by the medical review team, which approves and disapproves specific treatments, in favor of an alternative treatment plan consisting of conservative medical management and physical therapy. On April 4, 2017, Jamison saw Dyson again and informed him of that determination. Dyson reported that the Kenalog injection had provided some relief and requested an injection in his right knee, which Jamison provided. Jamison requested physical therapy sessions for Dyson.

On April 25, 2017, Dyson was evaluated by the physical therapist. The therapy plan was to use hot packs and conduct active range of motion, knee mobilization, strengthening, and balance exercises. Dyson attended physical therapy sessions on April 27, May 2, May 4, and May 9, 2017. He was re-evaluated by the physical therapist on May 16, 2017 and reported that the physical therapy was helping. Dyson then attended additional physical therapy sessions on May 16, May 18, June 20, June 27, and June 29, 2017. After a request for additional physical therapy was approved, and Dyson attended additional physical therapy on July 6, July 11, and July 13, 2017, Dyson reported that the physical therapy had somewhat improved his condition.

In the mean time, during a visit to Jamison on May 25, 2017, Dyson requested and received another Kenalog injection to the left knee. After Dyson requested refills of his prescriptions for Indomethacin and Glucosamine, his prescription for Glucosamine was renewed. There is no record whether Dyson's prescription for Indomethacin was renewed during July or August 2017.

On August 24, 2017, Dyson filed a sick call slip complaining that both of his knees were giving out and that his back had begun to hurt. When examined by a nurse, on August 26, 2017, he reported that the pain was as high as ten on a ten-point scale but reported no pain when sitting.

4

He also complained of clicking and crunching sounds upon bending his knees. According to Dyson, in August 2017, Dr. Memarsadeghi "talked about financial excuses why I am yet to receive total knee replacement surgery." Compl. at 11, ECF No. 1.

On September 6, 2017, Jamison evaluated Dyson again. Dyson advised that he still used a cart to get to the dispensary and that physical therapy had not been effective. Dyson also reported that the right knee Kenalog injection was effective for less than 90 days and that the left knee injection was not effective. Jamison then placed a renewed request for an orthopedic consultation, noting that the conservative treatment plan had not been effective. Dyson was prescribed Glucosamine as well as Mobic for pain and Medrol to reduce inflammation. Jamison saw Dyson again on October 10, 2017 and advised that the request for an orthopedic consultation had not yet been approved. According to Dyson, in September and October 2017, both his knees had totally given out. He could not walk and was in chronic debilitating pain, forcing him to sleep on the floor.

On October 18, 2017, the request for an orthopedic consultation was approved. On November 3, 2017, Dyson was examined by Dr. Manning, the orthopedist. Dyson reported that the steroid injections had provided mild relief, that the physical therapy was ineffective, and that Glucosamine and the other medications prescribed to him had not provided relief. Dr. Manning diagnosed Dyson as suffering from osteoarthritis in both knees. In discussing treatment options, Dr. Manning noted that Dyson may need a total knee replacement in the future. However, Dr. Manning's immediate plan was to provide Dyson a Synvisc injection in both knees.

On November 6, 2017, Dyson saw Dr. Memarsadeghi as a follow-up to the orthopedic evaluation. Dr. Memarsadeghi submitted a non-formulary request for Synvisc as well as a

5

consultation request for orthopedic follow-up. The Synvisc injection was approved on November 28, 2018. Dr Manning injected Synvisc into both of Dyson's knees on December 1, 2017.

Based on a sick call request complaining of back pain, Dyson was seen by a nurse on December 11, 2017. Dyson told the nurse that he was not sure if his back pain was related to his knee pain and expressed that the pain was six on a ten-point scale while sitting and eight on a ten-point scale while walking. Dyson was advised to do gentle stretching exercises and to obtain a muscle rub from the commissary and submit a sick call slip if his symptoms did not improve within seven days.

On January 26, 2018, during an examination with a nurse practitioner, Dyson reported that his pain levels had improved significantly since he received the Synvisc injections and that he could again walk with a cane. He was scheduled for follow-up in 90 days.

Although Dyson's prescriptions for Mobic and Glucosamine expired on January 6, 2018, he did not request refills until February 8, 2018. On March 6, 2018, he submitted another sick call request seeking refills on his prescription medication, stating that he had been out of pain medication for weeks. Jamison issued renewed prescriptions on March 8, 2018. In June 2018, Dyson submitted several sick call requests complaining that he had not received his Mobic, but he received that medication during that month. After the Mobic prescription expired on July 8, 2018, Dyson filed several sick call requests seeking its renewal.

On June 7, 2018, Dyson filed a sick call request stating that he was supposed to see Dr. Manning again for another Synvisc injection and was referred to a medical provider. However, at the time of visits with nurses on July 30, 2018 and August 12, 2018, he had not received any new injections. On those occasions, he described his pain as nine on a ten-point scale, asked about the status of his Synvisc injection and asked that his expired Mobic prescription be refilled.

6

On August 16, 2018, Jamison saw Dyson. Dyson reported that the Synvisc injection had provided four months of relief, but the pain had returned. He reported that his right knee had given way recently, causing him to fall and injure his finger and elbow. He requested a follow-up consultation with Dr. Manning. Jamison renewed his prescriptions for Mobic and Glucosamine and requested the follow-up orthopedic consultation. The consultation request was approved on August 29, 2018.

On September 7, 2018, Dr. Manning evaluated Dyson again. Dyson reported that the Synvisc injection had provided four months of pain relief but the pain had returned, and Mobic was ineffective to treat his pain. Although Dr. Manning discussed the options of another Synvisc injection or knee replacement, he recommended as a next step a repeat Synvisc injection in both knees. Dr. Manning also recommended a tapering dose of Prednisone before the Synvisc injections.

On October 2, 2018, Jamison ordered the tapering dose of Prednisone and submitted a request for the Synvisc injections and follow-up consultation with Dr. Manning. The Synvisc was approved on October 17, 2018. On November 2, 2018, Dr. Manning injected the Synvisc into both of Dyson's knees.

During a November 13, 2018 follow-up visit with a nurse practitioner, Dyson reported improvement in his left knee but no relief in his right knee following the Synvisc injections. Dyson reported that he did not have pain when moving his left knee but experienced moderate pain when moving his right knee. On December 31, 2018, Wexford's contract as the medical provider for DPSCS expired.

According to Dr. Erwin Aldana, the former Regional Medical Director for Wexford, Dyson received appropriate conservative care for his knee condition up until the end of Wexford's

7

contract, including the provision of appropriate pain medication. In particular, Dr. Aldana asserts that at no time from Dyson's evaluation at Bon Secours Hospital in 2010 through Dr. Manning's orthopedic consultations in 2017 and 2018 has any orthopedist recommended knee replacement surgery as the appropriate course of action.

For his part, Dyson has submitted affidavits from two correctional officers, a mental health associate, and several inmates attesting to the debilitating condition of his knees. For example, in an affidavit, Correctional Officer II ("CO II") M. Baird asserts that since 2016 he has observed Dyson on multiple occasions falling on the stairs, requiring assistance to avoid falling in the shower, and complaining about his knee pain. Likewise, CO II D. Scott has stated in an affidavit that he has observed Dyson fall, be in pain, and use a laundry cart and other objects to assist him in walking around. Isaac Gray, a Mental Health Associate at RCI, has stated that he has seen Dyson having to use a cart in order to assist him in walking and has seen him in anguish over his pain. Other inmates have attested that they have seen Dyson in extreme pain, that he walks with a cane or pushing a cart, that his knees lock up or give out, and that when he stands up, he must pull himself up while holding onto his bunk.

## DISCUSSION

In his Complaint, Dyson alleges that Defendants were deliberately indifferent to his persistent knee pain, in violation of the Fifth, Eighth, and Fourteenth Amendments. In particular, he asserts that although a doctor at Bon Secours Hospital advised in 2010 that he needed total knee replacement surgery, Defendants did not provide such surgery and also provided inadequate pain management. He seeks damages, a declaratory judgment, and an injunction requiring knee replacement surgery.

### I. Motion for Appointment of Counsel

Dyson seeks the appointment of counsel, stating that there are complex medical issues in this case. In civil actions, the Court appoints counsel only in exceptional circumstances. *Cook v. Bounds*, 518 F.2d 779, 780 (4th Cir. 1975). In doing so, the Court considers "the type and complexity of the case," whether the plaintiff has a colorable claim, and the plaintiff's ability to prosecute the claim. *See Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984) (citations omitted), *abrogated on other grounds by Mallard v. U.S. Dist. Court for the S. Dist. of Iowa*, 490 U.S. 296 (1989). Exceptional circumstances include a litigant who "is barely able to read or write," *id.* at 162, or clearly "has a colorable claim but lacks the capacity to present it," *Berry v. Gutierrez*, 587 F. Supp. 2d 717, 723 (E.D. Va. 2008). Upon consideration of Dyson's filings, the Court finds that he has demonstrated the ability either to articulate the legal and factual basis of his claims himself or to secure meaningful assistance in doing so. The Court also finds that, at this stage of the proceedings, there is no need for discovery, expert witnesses, or a hearing. The Motion for Appointment of Counsel will therefore be denied.

### II. Motions to Dismiss or, in the Alternative, Motions for Summary Judgment

In their Motions, Defendants seek dismissal under Federal Rules of Civil Procedure 12(b)(6) or summary judgment under Rule 56. Specifically, the Medical Defendants argue that Wexford cannot be liable because Dyson has failed to identify any custom or policy of deliberate indifference to serious medical needs, and that any clams of medical negligence are not actionable in a federal civil rights case. The Correctional Defendants argue that they are entitled to Eleventh Amendment immunity for any claims brought against them in their official capacity, they are not liable because they were not personally involved in the alleged wrongdoing, and they are entitled to qualified immunity. All Defendants argue that the record evidence establishes that Defendants

did not violate Dyson's constitutional rights because they were not deliberately indifferent to his medical needs.

### A. Legal Standard

Typically, when deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers only the complaint and any attached documents "integral to the complaint." *Sec'y of State for Def. v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Rule 12(d) requires courts to treat such a motion as a motion for summary judgment where matters outside the pleadings are considered and not excluded. Fed. R. Civ. P. 12(d). Before converting a motion to dismiss to one for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* "Reasonable opportunity" has two requirements: (1) the nonmoving party must have some notice that the court is treating the Rule 12(b)(6) motion as a motion for summary judgment, and (2) the nonmoving party "must be afforded a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (citation omitted). Here, the notice requirement has been satisfied by the title of Defendants' Motions. To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party must file an affidavit or declaration under Rule 56(d) explaining why "for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d); *see Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244–45 (4th Cir. 2002). Dyson has not asserted that he needs additional discovery in order to address the Motions. The Court therefore will construe Defendants' Motions as motions for summary judgment.

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the

moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, "with all justifiable inferences" drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.*

### B.      Correctional Defendants

In the Maryland prison system, inmate medical care is provided by privately contracted medical care providers. There are no allegations and no facts supporting the claim that either Warden Miller or former Acting Warden Gelsinger, who are not licensed health care providers, had any personal involvement in the provision of medical care to Dyson or any other RCI inmate. In a declaration, Gelsinger states, without dispute, that Wardens and Acting Wardens have no authority to make decisions relating to an inmate's medical care or to order the medical staff to prescribe any particular medication or perform any particular medical procedure.

It is firmly established that the doctrine of vicarious liability, or *respondeat superior*, does not apply to § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (holding that there is no *respondeat superior* liability under § 1983). Particularly where neither Warden Miller or Acting Warden Gelsinger were supervisors of any of the medical personnel, they can be found liable pursuant to U.S.C. § 1983 only if they participated personally in the deprivation of constitutional rights. *See Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001). Neither of the

11

Correctional Defendants had any personal involvement in providing medical care to Dyson or even in the decision whether to allow Dyson to see a medical provider. Indeed, there is no evidence that any correctional officer prevented Dyson from seeing medical professionals. To the extent that either Correctional Defendant played any role in the review of Dyson's ARPs relating to his medical care, such involvement does not amount to sufficient personal participation in the denial of medical care to support liability under § 1983. *Whitington v. Ortiz*, 307 F. App'x 179, 193 (10th Cir. 2009). Rather, correctional personnel may rely on the judgments of medical providers on the appropriate medical treatment to provide. *See Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990) (declining to find wardens liable because they were entitled to rely on the health care providers' expertise), *overruled in part on other grounds by Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The Court will therefore grant the Correctional Defendants' Motion.

### C. Wexford

Wexford is a private corporation that, at the time of the events in question, had a contract to provide health care to Maryland state prisoners. Entities such as Wexford may be held liable under § 1983 only to the extent that they have a custom or policy that causes a violation of the Constitution or laws of the United States, such as a policy of deliberate indifference to serious medical needs. *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727-28 (4th Cir. 1999); *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690-91 (1978).

Here, Dyson has alleged no custom or policy of Wexford to deny adequate medical treatment to inmates in general or to inmates with knee problems in particular. Although Dyson alleges that his total knee replacement was not approved for cost reasons, he does not squarely assert that Wexford has such an overarching policy, and he provides no evidence that such a policy exists. Moreover, as discussed more fully below, there is no evidence in Dyson's medical records

that any physician recommended that he receive a total knee replacement in the first place. The Medical Defendants' Motion will therefore be granted as to Wexford.

### D. Deliberate Indifference

Dyson asserts that Defendants violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution by providing inadequate medical care relating to his knee and, arguably, pain in his hip and back. The Eighth Amendment protects prison inmates from "cruel and unusual punishments." U.S. Const. amend. VIII. In order to state an Eighth Amendment claim arising from inadequate medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. *Hudson v. McMillan*, 503 U.S. 1, 9 (1992). A medical condition is serious when it is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241 (citation omitted).

As for the subjective component, "[a]n official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively knows of and disregards an excessive risk to inmate health or safety." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[I]t is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id.* (citations

13

omitted). "[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Id.* Thus, "[d]eliberate indifference is more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (citations and internal alterations omitted). Under this standard, a mere disagreement between an inmate and a physician over the appropriate level of care does not establish an Eighth Amendment violation absent exceptional circumstances. *Id.* Moreover, even if the requisite subjective knowledge is established, an official may avoid liability if the official "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

Although Dyson plainly has a serious medical need arising from his chronic knee pain, the record does not support a finding that Defendants acted with deliberate indifference to that need. The medical records establish that from January 2017 to the end of the Wexford contract in December 2018, Dyson was regularly seen by medical staff who ordered pain medication, provided assistive ambulatory devices, ordered diagnostic testing such as x-rays, arranged for consultations with specialists, and provided specific treatments targeted to address Dyson's knee pain. In early 2017, the most direct form of treatment of Dyson's knee pain was the Kenalog steroid injections. Although Jamison's request for an orthopedic consultation was initially denied, Dyson then received physical therapy from April to July 2017. When those forms of treatment proved ineffective, Jamison renewed the request for an orthopedic consultation, which was approved in October 2017. When Dr. Manning, the orthopedist, examined Dyson, he chose to try Synvisc injections before considering knee replacement surgery. These injections provided relief for several months, and when the effect wore off, Dr. Manning elected to provide additional

14

Synvisc injections rather than move to surgery. Although Dyson may now disagree with this course of treatment, this type of disagreement with medical providers does not establish deliberate indifference. *See Scinto*, 841 F.3d at 225. Notably, while Dyson claims that specialists had recommended knee replacement surgery, there is no evidence of such a recommendation. Although Dr. Manning may have discussed knee replacement surgery with Dyson as a potential option, the medical records establish that he ultimately recommended the Synvisc injections. As for Dr. Krishnaswamy, the Bon Secours Hospital orthopedist who examined Dyson in 2010, the medical records establish that he recommended an arthroscopic surgical procedure on the left knee, which was performed. There is no evidence that he recommended total knee replacement. Even if he had done so, the ultimate decision to follow Dr. Manning's recommendation for Synvisc injections instead, which provided relief for a period of time, would not constitute deliberate indifference. *See id.*

To the extent that Dyson argues that the Medical Defendants did not provide him with adequate pain medication, the record reflects that Dyson was regularly and consistently prescribed such medication, including Indomethacin and Mobic. Although there were interruptions in his receipt of pain medication at times and periods when his prescriptions were not renewed in a timely manner, a review of the prescription history shows that the gaps were of such a limited nature that they cannot support a claim of deliberate indifference by the Medical Defendants. Indeed, the inability to resolve Dyson's pain does not, by itself, establish deliberate indifference. *See, e.g., Thomas v. Coble*, 55 F. App'x 748, 749 (6th Cir. 2003) (holding that the claim that pain medication was ineffective did not establish deliberate indifference). Finally, to the extent that Dyson briefly refers in his Complaint to his back pain, there is no evidence in the medical records that during the relevant time period that Dyson was denied necessary medical treatment for any back pain.

15

Where Defendants and other medical providers gave regular attention to Dyson's knee condition and resulting pain, and provided specific treatment for his condition including the Synvisc injections, the Court concludes that the record, even viewed in the light most favorable to Dyson, does not support a finding that they acted with deliberate indifference to his medical needs. The Court will therefore grant summary judgment on Dyson's constitutional claims. The Court need not and does not address Defendants' remaining arguments.

In so ruling, the Court does not conclude that Dyson's knee condition has been resolved or that he does not need knee replacement surgery presently or in the future. Where not only other inmates, but also two correctional officers, have provided declarations attesting that Dyson's knee condition is causing him serious pain and adverse consequences, it is clear that Dyson continues to require significant medical attention for his knees, and if the treatments already attempted have not resolved his pain, the RCI medical staff must reconsider knee replacement surgery and provide it if warranted. In any future assessments, the new contract medical provider that succeeded Wexford will be deemed to have full knowledge of the past course of treatment and could be deemed deliberately indifferent if it seeks to repeat procedures that were unsuccessful in the past before considering options such as knee replacement surgery.

### E.  Preliminary Injunction

In his Complaint, Dyson seeks an injunction requiring that he receive knee replacement surgery and related treatment. In his brief opposing the Medical Defendants' Motion, Dyson states that he is seeking an "emergency [i]njunction" requiring that an orthopedic specialist decide whether knee replacement surgery is warranted. Opp'n Med. Defs.' Mot. Summ. J. at 11, ECF No. 27. To the extent that this request could be construed as a motion for a preliminary injunction, it fails. To obtain a preliminary injunction, moving parties must establish that: (1) they are likely

to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *see Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). Because a preliminary injunction is "an extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. As discussed above, Dyson has failed to demonstrate that he can succeed on his claims. Accordingly, he has not demonstrated a likelihood of success on the merits such that any request for a preliminary injunction must be denied.

## CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss or, in the Alternative, Motions for Summary Judgment will be GRANTED. The Complaint will be DISMISSED as to Defendant Dr. Didden. A separate Order shall issue.

Date: March 10, 2020

THEODORE D. CHUANG
United States District Judge